IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LYNN LAFIANDRA<br>*Plaintiff,*<br><br>*v.*<br><br>ACCENTURE, LLP<br>*Defendant,*<br><br>*and*<br><br>BARBARA HARVEY<br>*Defendant,*<br><br>*and*<br><br>FRANCIS HINTERMANN<br>*Defendant.* | CIVIL TRIAL DIVISION<br><br><br>JURY TRIAL DEMANDED<br><br>N0 21-CV-3261 |

## AMENDED CIVIL ACTION COMPLAINT

Plaintiff, Lynn LaFiandra, by and through her attorney and husband, Kenneth LaFiandra, Esquire, hereby files this Amended Complaint against Defendants Accenture, LLP, Barbara Harvey, and Francis Hintermann, (collectively "Defendants") and avers in support thereof as follows:

## INTRODUCTION

1.     This matter arises, *inter alia*, from the wrongful September 25, 2020 termination of Plaintiff Lynn LaFiandra which was the result of Defendant Accenture, LLP's disability discrimination, harassment and retaliation for seeking disability leave, filing for FMLA, and age discrimination.

2.     This matter also arises from the tortious actions of Defendants Barbara Harvey and Defendant Francis Hintermann, all resulting in the wrongful termination of the Plaintiff Lynn LaFiandra.

3.      Finally, this matter arises from the providing of false testimony under oath with the EEOC by Defendant Accenture, Defendant Harvey and Defendant Hintermann.

## PARTIES

4.      Plaintiff Lynn LaFiandra ("Plaintiff") is an adult individual residing in Bryn Mawr, Pennsylvania. ("Plaintiff's Residence").

5.      At all times relevant, the Plaintiff was assigned to work out of the Plaintiff's Residence and Defendant Accenture's office located in Philadelphia, Pennsylvania.

6.      Upon information and belief, Defendant Accenture, LLP, ("Defendant Accenture") was and continues to be an Illinois limited liability partnership having its corporate offices located in Chicago, Illinois, is duly authorized and registered to conduct business in Pennsylvania and maintains a Pennsylvania office at in Philadelphia, Pennsylvania.

7.      Upon information and belief, Defendant Barbara Harvey, ("Defendant Harvey"), is an adult individual residing in Hertfordshire, United Kingdom.

8.      Upon information and belief, Defendant Francis Hintermann ("Defendant Hintermann"), is an adult individual residing in New York City, New York.

## JURISDICTION

9.      This is a civil action arising under the laws of the United States and is, *inter alia*, brought pursuant to the Americans with Disabilities Act of 1990, *as amended*, 42 U.S.C.§12101 *et seq.* (hereinafter "ADA") and the Age Discrimination in Employment Act of 1967, *as amended*, 29 U.S.C. §29 U.S.C. 621 *et seq.* (hereinafter "ADEA"), 42 U.S.C. n§1981a and 42 U.S.C. §1988 and the Family and Medical Leave Act of 1993, *as amended*, 29 U.S.C. §2612 *et seq.* (hereinafter referred to as the "FMLA").

10.     At all times relevant, Defendant Accenture was and continues to be an "employer" within the meaning of the FMLA, in that is engaged in commerce and/or in an activity or industry affecting commerce, and employs fifty (50) or more employees for each working day during each of twenty (20) or more calendar work weeks in this current and/or proceeding calendar year. 29 C.F.R. § 825.104(a).

11.     At all times relevant herein the Plaintiff was an "eligible employee" of Defendant Accenture and was at all times entitled to the protections of the ADA, ADEA FMLA and PHRA.

12.     At all times relevant herein, Defendant Accenture was an "employer" as that term is defined in the ADEA.

13.     The Plaintiff is, and at all times relevant was, over the age of 40 years old.

14.     This Court has jurisdiction on claims pursuant to 28 U.S.C. §1331 and 28 U.S.C. § 1343.

15.     This Court also has pendant and supplemental jurisdiction over the Plaintiff's Pennsylvania state law claims pursuant to 28 U.S.C. §1367. These claims are brought pursuant to the Pennsylvania Human Relations Act, 43 P.S. §951 *et seq*. ("PHRA") and common laws.

16.     This Court has specific jurisdiction over Defendant Accenture in that the claims in this matter arise from Defendant Accenture's specific activities in or directed toward this forum state and the claims asserted in this matter are related to those activities and it has over many years developed a contractual relationship with continuing and wide-reaching contacts in this forum state, or and deliberately exploited the market in this forum state.

17.     This Court has general jurisdiction over Defendant Accenture in that Defendant Accenture has continuous and systemic contacts with this state forum.

18.     This Court has specific jurisdiction over Defendant Harvey in that the claims in this matter arise from Defendant Harvey's specific activities in or directed toward this forum state and the claims asserted in this matter are related to those activities and she has over many years developed a contractual relationship with continuing and wide-reaching contacts in this forum state, or and deliberately exploited the market in this forum state.

19.     This Court has general jurisdiction over Defendant Harvey in that Defendant Harvey has continuous and systemic contacts with this state forum.

20.     This Court has specific jurisdiction over Defendant Hintermann in that in that the claims in this matter arise from Defendant Hintermann's specific activities in or directed toward this forum state and the claims asserted in this matter are related to those activities and he has over many years developed a contractual relationship with continuing and wide-reaching contacts in this forum state, or and deliberately exploited the market in this forum state.

21.     This Court has general jurisdiction over Defendant Hintermann in that Defendant Hintermann has continuous and systemic contacts with this state forum, including but not limited to, continuously and systematically conducting business in the United States, maintaining an office in the United States and by maintaining his residence the United States.

## **VENUE**

22.     The Defendants transact business and/or are found in this district.

23.     Venue is proper in this district pursuant to 28 U.S.C. §139(b) because the Plaintiff's claims arise out of incidents which occurred within this judicial district.

## PROCEDURAL REQUIREMENTS

24.     On or about November 10, 2020, the Plaintiff filed an ADA, ADEA, and PHRA Charge of Discrimination with the U.S. EEOC against Defendant Accenture alleging unlawful discrimination and retaliation, Charge 530-2021-00614.

25.     On or about April 26, 2021, the Plaintiff requested and later received a "Right to Sue" letter for her Title VII of the Civil Rights Act of 1964, the American with Disabilities Act ("ADA"), Age Discrimination in Employment Act ("ADEA") and PHRA claims. *See* EEOC Notice of Right to Sue, dated April 26, 2021 *attached as* "Exhibit A".

26.     The Plaintiff has commenced this action within 90 days of receiving the Right to Sue Letter.

## FACTUAL BACKGROUND

### A. Plaintiff Is Hired By Defendant Accenture In 1995.

27.     On or about December 18, 1995, the Plaintiff was hired as a Senior Consultant for Defendant Accenture, then trading as Anderson Consulting, LLC.

28.     The Plaintiff was continuously employed by Defendant on a full-time and for a brief period on a part-time basis for her 25 years at Defendant Accenture until her discharge by Defendant Accenture.

29.     During her 25-year tenue at Accenture, the Plaintiff worked on Accenture's highest profile research projects and was recognized by her peers and internal clients at Defendant Accenture as a seasoned expert in her field of research design, survey creation and data analysis. *See* 2019-2020 Performance Reviews, *attached as* Exhibit B.

30.     While employed at Defendant Accenture, the Plaintiff consistently received very positive performance evaluations from her internal clients who were in positions to evaluate her work product.  *See* <u>Exhibit B</u>.

31.     Because of her recognized expertise in research design, survey creation and data analysis, the Plaintiff's skills were consistently in high demand and her billable time targets determined by Accenture Research were met.

**B.  Defendant Harvey Is Appointed As The Plaintiff's Career Counselor.**

32.     During the Fall of 1999 until the Fall of 2014, Defendant Harvey served as the Plaintiff's "Career Counselor".

33.     As the Plaintiff's Career Counselor, Defendant Harvey assumed control over the Plaintiff's workload, assignment selection, and was responsible for collecting analyzing and preparing the Plaintiff's annual job performance evaluations that were used to determine the Plaintiff's critical annual bonuses and career path.

34.     During her tenure as the Plaintiff's Career Counsel, Defendant Harvey recognized the value of the Plaintiff's skills and assigned Accenture's highest profile and most critical projects to the Plaintiff.

35.     Because of the usefulness of the work performed by the Plaintiff on complex projects, Defendant Harvey relied on the Plaintiff for her expertise in designing surveys for projects managed by Defendant Harvey.

36.     As time progressed, and as Defendant Harvey assumed control of more complex projects, the make or break success of many of Defendant Harvey's projects was dependent on the contributions demanded of the Plaintiff.

### C. Defendant Hintermann Is Appointed As The Plaintiff's Career Counselor In The Fall Of 2014

37.     During the Fall of 2014, Defendant Hintermann was appointed to be the Plaintiff's new Career Counselor, replacing Defendant Harvey as the Plaintiff's Career Counselor.

38.     As the Plaintiff's new Career Counselor, Defendant Hintermann was supposed to be responsible for: supervising and monitoring the workload of the Plaintiff, acting as Defendant Accenture's key agent to intercede in any work-related problems, acting as the key personnel in the collection all of the reviews of the Plaintiff's work and in preparing the Plaintiff's annual performance review and ultimately, formulating the legal reason for any termination.

39.     In sharp contrast to the new broad supervisory duties of Defendant Hintermann, Defendant Harvey was not supposed to be involved as the Plaintiff's Career Counselor nor to retain any of the broad powers of control she formerly had as the Plaintiff's Career Counselor.

40.     After the appointment of Defendant Hintermann as the Plaintiff's Career Counselor, Defendant Harvey's involvement in the evaluation of the work product of the Plaintiff was supposed to be limited to the Plaintiff's performance on the projects in which Defendant Harvey was personally managing.

### D. The Plaintiff Sustains Neurological Damage As A Pedestrian In A Motor Vehicle Accident.

41.     On July 8, 2015, while crossing the street in a crosswalk, the Plaintiff was hit by a car and knocked to the ground, striking her head on the street. ("Accident").

42.     As a result of this Accident, the Plaintiff sustained, *inter alia*, a concussion that resulted in long-term neurological deficits.

43.     As a result of her sustained neurological injuries, the Plaintiff began to experience serve painful headaches after even moderate computer screen viewing time. ("Computer Screen Time Headaches").

44.     On or about August 31, 2015, the Plaintiff's initial diagnosis of a concussion with neurological deficits was medically confirmed.

45.     The Plaintiff's Computer Screen Time Headaches, once provoked, resulted in loss of one day or more of work to resolve the symptoms, such as avoiding light and noise.

46.     As a result of the frequent occurrences of Computer Screen Time Headaches, the Plaintiff was instructed by her treating neurological doctors to limit her computer screen time exposure and workday.

47.     As a result of her sustained neurological injuries, the Plaintiff was prescribed by her treating neurological doctors, three types of therapy administered over two days per week.

### E. The Plaintiff's Disability Is Acknowledged By Accenture's Disability And Accommodations Teams And Case Workers Were Assigned.

48.     In early September of 2015, the Plaintiff, in a timely manner, notified her Career Counselor Defendant Hintermann of the Accident and her resulting injuries, including neurological deficits.

49.     The Plaintiff provided Defendant Accenture with all medical records and proof of the occurrence of the Accident as well proof of the Plaintiff's diagnosis, prognosis and treatment protocols.

50.     As a result of her diagnosis, the Plaintiff was scheduled for three types of therapy each week each: speech therapy for mental processing, physical therapy for balance, and occupational therapy for vision and object tracking.

51.     On Tuesday and Friday mornings, the Plaintiff would go to therapy before starting her workday.

52.     In light of the medical confirmation of her disability, Defendant Accenture's disability case worker placed the Plaintiff on short-term disability to allow her the time to receive therapy.

### F. Defendant Harvey Is Openly Hostile To The Plaintiff's Approved Disability Leave.

53.     At all times relevant, Defendant Harvey is and was a Managing Director at Defendant Accenture and had the responsibility to manage, *inter alia*, Accenture's annual International Women's Day Research Project ("Annual Women's Day Project").

54.     Prior to Defendant Harvey interjecting herself into the leadership role of the Annual Women's Day Project, the Annual Women's Day Project was successfully led by the Plaintiff for many years.

55.     Leading the Annual Women's Day Project gave Defendant Harvey, who was based in London, an opportunity to increase her visibility with Accenture's most senior leadership, located in the United States.

56.     Defendant Harvey needed the Plaintiff to lead the survey research for the 2016 Annual Women's Day Project as the Plaintiff had the experience and relationships with the very senior internal clients from past years.

57.     On or about September 2015, the Plaintiff began working with Defendant Harvey on the research for the 2016 Annual Women's Day Project.

58.     Defendant Harvey was leading the research effort and during a call on September 24, 2015 ("September 24 Conversation"), Defendant Harvey made increasing demands on the Plaintiff for the upcoming 2016 Annual Women's Day Project.

59.     During the September 24 Conversation, the Plaintiff explained to Defendant Harvey that she had a concussion. Defendant Harvey responded with, "you'll be fine".

60.     During the September 24 Conversation, when the Plaintiff told Defendant Harvey that she was scheduled to start therapy and her approved therapy schedule would prevent her from attending calls on Tuesday and Friday mornings, Defendant Harvey became openly hostile to the Plaintiff's approved disability leave and ridiculed and harassed the Plaintiff by saying "Why? Are they giving you money?"

**G.  Harvey's Resistance To The Plaintiff's Disability Status Increases.**

61.     On or about November 16, 2015 ("November 16 Conversation"), Defendant Harvey pulled the Plaintiff into the initial call for another project called Girls Who Code ("GWC").

62.     During the November 16 Conversation, the Plaintiff informed Defendant Harvey, that given her disability status and her existing workload, which was rather substantial for employees without any disabilities, and her therapy needs, she couldn't take on another intense project.

63.     During the November 16 Conversation, upon being informed of the Plaintiff's inability to work on GWC, Defendant Harvey became frustrated with the Plaintiff's inability to give her more time and desperate for support from an experienced survey researcher.

**H.  Defendant Harvey Begins To Cloak Her Hostility And Harassment Toward The Plaintiff After The Plaintiff Reports Defendant Harvey To Accenture's Human Resource Department.**

64.     On or about November 18, 2015, the Plaintiff had a call with Maria Paz Ovidi of Defendant Accenture's Human Resource Department ("HR Representative

Ovidi") to discuss the Plaintiff's concerns with Harvey's harassment and open hostility and retaliatory acts toward the Plaintiff ("November 18 HR Conversation").

65.     During the November 18 HR Conversation, Human Resource Representative Ovidi was put on notice of Defendant Harvey's hostility and harassment toward the Plaintiff's approved disability leave.

66.     Despite being put on notice of Defendant Harvey's open hostility and harassment of the Plaintiff's approved disability leave, Defendant Accenture failed to offer the Plaintiff options for working conditions to enable her to avoid continued harassment and retaliatory actions by Defendant Harvey and to properly shield the Plaintiff from Defendant Harvey's retaliation.

67.     Human Resource Representative Ovidi failed to fully investigate the Plaintiff's claims of harassment, failed to protect the Plaintiff and only provided the Plaintiff with an offer to file a formal grievance.

68.     The filing of a formal grievance without any other protections against the retaliatory actions of Defendant Harvey was a woefully inadequate remedy to the acknowledged act of disability discrimination of Defendant Harvey.

69.     After the November 18 HR Conversation, Defendant Harvey reduced her openly hostile statements to the Plaintiff, but continued to take covert hostile and retaliatory actions against the Plaintiff as described below.

I.   **Defendant Harvey Lashed Out Against The Plaintiff For Requesting Two Days Of PTO In Addition To Time Off For Therapy While Others Were Permitted To Take More Than Two Weeks Without Issue.**

70.     At or around January of 2016, the Plaintiff requested two days of PTO to take her daughter to an athletic competition that was to occur on or about January 28-29, 2016 ("January 2016 PTO Request").

71.    After Defendant Harvey became hostile toward the Plaintiff for wanting time off, the Plaintiff indicated she would work during these two PTO days as much as she could.

72.    As she had done in the past when being asked for time off for therapy, Defendant Harvey refused to grant the PTO and became hostile toward and harassed the Plaintiff.

73.    In a follow up live call, Defendant Harvey again was openly hostile toward the Plaintiff for taking off too much time off for her therapy during the 2016 Annual Women's Day Project and refused to grant two days PTO for the January 2016 PTO Request.

74.    Defendant Harvey's time demands were only directed toward the Plaintiff as other employees at that same time, were allowed to take weeks of PTO without any reaction from Defendant Harvey.

75.    The Plaintiff worked on her two PTO days and most of the weekend during her daughter's competition, out of fear Defendant Harvey would fire her if she didn't work during that time.

76.    Defendant Harvey's hostility and retaliatory behavior and disability disparaging treatment in response to the Plaintiff's request for PTO was not managed or addressed by Defendant Accenture's Human Resource Department.

77.    Defendant Accenture failed to prevent and correct Defendant Harvey's disparate treatment of the Plaintiff because of her disability.

**J. Defendant Hintermann And Defendant Accenture Again Fail To Shield The Plaintiff Against Defendant Harvey's Continued Hostility And Retaliatory Behavior Against The Plaintiff.**

78.    On or about August 3, 2016, Defendant Harvey again requested the Plaintiff's help in the subsequent year, 2017 Annual Women's Day Project.

79.    Since Defendant Hintermann and Defendant Accenture were not monitoring the actions of Defendant Harvey, the Plaintiff again was forced to work on another Defendant Harvey project since she feared what Defendant Harvey would do if the Plaintiff did not work on her 2017 Annual Women's Day Project.

80.    On September 4, 2016, Defendant Harvey provided a performance review for the Plaintiff's work on the 2016 Annual Women's Day Project. *See* 2016 Harvey Performance Review, *attached as* Exhibit C.

81.    While Defendant Harvey was forced to acknowledge in the 2016 Harvey Performance Review, the Plaintiff's expertise and contribution, "I could not have done IWD 2016 (2016 Annual Women's Day Project) without Lynn, she worked hard through a time when she was not operating as effectively as she has done in the past for medical reasons", Defendant Harvey still was allowed to use this performance review to retaliate against the Plaintiff for being on approved disability by stating, "we had a few difficult moments managing her time and mine and with her being available when needed." *See* Exhibit C.

82.    On or about October 24, 2016, the Plaintiff met with Defendant Hintermann for her annual review and discussed Defendant Harvey's feedback in the 2016 Harvey Performance Review ("October 24 Hintermann Meeting").

83.    Despite having full knowledge of Defendant Harvey's hostility and retaliatory behavior toward the Plaintiff, Defendant Hintermann and Defendant Accenture

wrongfully allowed Defendant Harvey's clearly retaliatory review of the Plaintiff to be submitted as part of Plaintiff's performance review and used as a legitimate evaluation of the Plaintiff's work performance on Defendant Harvey's 2016 Annual Women's Day Project.

84.    During the October 24 Hintermann Meeting, Defendant Hintermann twice recommended to the Plaintiff that the Plaintiff "get off the project", referring to the ongoing 2017 Annual Women's Day Project.

85.    Despite acknowledging that Defendant Harvey was clearly harassing and retaliating against the Plaintiff and despite twice advising the Plaintiff to take actions to protect herself, Defendant Hintermann and Defendant Accenture, did nothing to protect the Plaintiff, did nothing to aid the Plaintiff in exiting the 2017 Annual Women's Day Project, and did nothing to stop the harassment and retaliatory actions of Defendant Harvey.

86.    Given the lack of protection of her disability rights by Defendant Accenture and Defendant Hintermann, the Plaintiff was only able to leave the 2017 Annual Women's Day Project on or around November 2, 2016, after designing the research and only after the survey was in the field, all to her great loss of disability rights.

87.    On or about November 2, 2016, following the recommendations of Defendant Hintermann of October 24, 2016, the Plaintiff informed Defendant Harvey that she could not continue on the project as Defendant Hintermann wanted her to focus on other priorities ("November 2 Project Departure Conversation").

88.    In response to the Plaintiff informing Defendant Harvey that Defendant Hintermann requested the Plaintiff focus on other priorities, Defendant Harvey asked the Plaintiff who she could get with the Plaintiff's level of expertise and skills to work on the

2017 Annual Women's Day Project, all confirming Defendant Harvey's heavy reliance on the Plaintiff to design and manage the survey for Defendant Harvey's own project.

**K. Defendant Accenture And Defendant Hintermann Again Fail To Protect The Disability Rights Of The Plaintiff By Allowing Defendant Harvey To Attempt To Recruit The Plaintiff To Work On The International Women's Day Project For A Third Year, 2018.**

89.    On or about August of 2017, Defendant Harvey again contacted the Plaintiff to work on the 2018 Annual Women's Day Project ("August 2017 Harvey Conversation").

90.    During the August 2017 Harvey Conversation, upon the recommendation of Defendant Hintermann, the Plaintiff declined involvement in the 2018 Annual Women's Day Project. The Plaintiff told Defendant Harvey that Defendant Hintermann wanted her to focus on her priorities which did not include the Annual Women's Day Project.

91.    On or about September 25, 2017, Defendant Harvey asked the Plaintiff to provide a quality assurance check for the online survey link to the 2018 Annual Women's Day Project. ("September 25, Harvey Conversation").

92.    The Plaintiff consulted with Defendant Hintermann, asking whether the Plaintiff should agree to help. Defendant Hintermann advised the Plaintiff not to get involved in the 2018 Annual Women's Day Project.

93.    The Plaintiff's refusal to work on this final project of Defendant Harvey on the 2018 Annual Women's Day Project during the September 25, Harvey Conversation only served to further enrage Defendant Harvey and increase her hostility and harassment toward the Plaintiff.

94.    Defendant Accenture and Defendant Hintermann again did nothing to protect the Plaintiff in her interaction with Defendant Harvey in the September 25, Harvey

Conversation or stop the harassment and retaliatory actions of Defendant Harvey that followed as a result of the Plaintiff declining to participate in the 2018 Annual Women's Day Project.

**L. Defendant Accenture And Defendant Hintermann Wrongfully Allowed Defendant Harvey To Continue Her Harassment By Inappropriately Interjecting Herself And Then Sabotaging The Plaintiff's 2018-2019 Performance Review.**

95.    After the Plaintiff no longer had any involvement with the Annual Women's Day Project and after the Plaintiff had intentionally steered clear of working with Defendant Harvey in any capacity, Defendant Harvey was wrongfully allowed by Defendant Accenture and Defendant Hintermann to have access to and have critical input into the Plaintiff's 2018-2019 annual performance review as part of Defendant Accenture's Research Leadership and did so by alleging that Defendant Harvey did not have sufficient and necessary visibility to the Plaintiff's work.

96.    Defendant Accenture and Defendant Hintermann additionally elevated the importance of the review by non-career counselor Defendant Harvey to one of great impact.

97.    This burden of making Defendant Harvey aware of Plaintiff's projects was a burden that no other team members were required to meet and was not a stated performance element for the Plaintiff.

98.    On October 21, 2019, the Plaintiff presented one of her research projects, <u>AI: Built to Scale</u> to the Accenture Research Thought Leadership Review Board ("AI Built to Scale Project") where Defendant Harvey was one of the reviewers on the Board.

99.    This would have been an ideal opportunity for Defendant Harvey to review one of the Plaintiff's iconic projects, but Defendant Harvey used that opportunity to excuse herself from the call as soon as the Plaintiff started her presentation.

100.     In or about November 2019, the Plaintiff met with Defendant Hintermann in New York City to discuss her 2018-2019 annual work performance. ("2019 Annual Review")

101.     During the 2019 Annual Review, Defendant Hintermann admitted that the Plaintiff's performance rating was lowered because Defendant Harvey claimed she did not have visibility into the Plaintiff's work projects.

102.     The only reason Defendant Harvey could claim to not have visibility into the Plaintiff's 2019 work performance was because she purposefully avoided reviewing readily and publicly available publications that were produced from the Plaintiff's research and witnessing work progress like that of the AI Built To Scale Project presentation.

103.     Defendant Harvey used her wrongful involvement in the Plaintiff's 2019 performance review process to continue to harass the Plaintiff.

104.     Defendant Hintermann and Defendant Accenture wrongfully allowed Defendant Harvey to continue her harassment and retaliation against the Plaintiff by wrongfully inviting Defendant Harvey to participate in the Plaintiff's 2019 Annual Review process and by wrongfully allowing Defendant Harvey to then sabotage the Plaintiff's otherwise excellent 2019 Annual Review outcome.

## M. Defendant Hintermann And Defendant Accenture Wrongfully Pressure Plaintiff To Limit Her Approved FMLA Leave.

105.     In November of 2019, during the 2019 Annual Review, Defendant Hintermann wrongfully pressured the Plaintiff to limit her authorized disability leave by first asking how much longer the Plaintiff would be on disability and then by stating "it has been a long time" and by asking why the Plaintiff was applying for FMLA.

106.    At the time of the 2019 Annual Review, the Plaintiff was on part-time disability that was to expire on October 30, 2020.

107.    In reply, the Plaintiff informed Defendant Hintermann that the HR person handling her disability leave suggested she apply for FMLA to protect her job.

108.    On April 7, 2020, the Plaintiff had a call with Amrita Vaz of Accenture Accommodations who asked if the Plaintiff would consider trying to work more hours ("April 7 Vaz Conversation").

109.    During both the 2019 Annual Review and the April 7 Vaz Conversation, the Plaintiff was on medically mandated disability leave that limited her work week to 30 hours per week or six hours per work day.

110.    During both the 2019 Annual Review and the April 7 Vaz Conversation, Defendant Hintermann and Defendant Accenture were put on full notice that the Plaintiff was on a limited work week since she had to limit the amount of computer screen time and limit the amount of mental processing time she experienced to avoid mental processing fatigue and severe headache pain from screen exposure.

111.    As a result of Defendant Accenture's and Defendant Hintermann's wrongful pressure on the Plaintiff to cut her approved disability accommodation short, and out of a fear of losing her job, the Plaintiff stated she would consult with her neurologist to see if she could safely return to work more than 30 hours per week.

112.    The Plaintiff was in the process of scheduling the next appointment with her neurologist, a difficult task during the Covid pandemic when she was terminated by Defendant Accenture on September 25, 2020.

113.    Upon information and belief, Defendant Hintermann's and Defendant Accenture's wrongful pressure campaign to have the Plaintiff cut her approved and

medically needed disability leave was the result of wrongful influences that Defendant Harvey was allow to exert on both Defendant Hintermann and the HR Department personnel at Defendant Accenture.

### N. The Plaintiff Is Terminated On September 25, 2020 In A Telephone Call With Defendant Hintermann.

114.    On or about September 25, 2020 ("Termination Date"), Defendant Accenture through its agent Defendant Hintermann terminated the Plaintiff.

115.    At the time of her termination, the Plaintiff was on disability and covered by FMLA.

116.    During the termination call, Defendant Hintermann first assured the Plaintiff multiple times that her termination was "not related to performance" and that it was part of the "cost efficiency program that has been decided".

117.    Defendant Hintermann knew at the time of termination that he could not use the CEO's widely publicized headcount reduction targeted at the "bottom 5%" of the workforce as a means to terminate the Plaintiff as the Plaintiff was a high performer and her performance reviews from prominent Managing Directors throughout the organization reflect this reality. *See* Plaintiff's Performance 2020, *attached as* Exhibit B.

118.    Defendant Hintermann was forced to conjure up a false narrative for the termination of the Plaintiff. On September 10, 2020, the Plaintiff was told that her "role will cease to exist" and that her termination was part of a "cost cutting" program.

119.    At the time of termination, the Plaintiff was one of approximately 15 researchers in the Global Survey Research Team, one of six Senior Principals in the Global Survey Research Team, and one of four Senior Principals in the U.S. Survey Research Team. The Plaintiff was the only one on the entire Survey Research Team who was terminated as part of the "cost efficiency program".

120.   When asked why the Plaintiff was selected as the one who was terminated among the entire team, Defendant Hintermann could not provide a rationale but insisted and assured the Plaintiff that it was not performance related.

121.   In addition, the "cost cutting" narrative was false on its face for the Plaintiff's termination was not necessary to reduce the number of employees in the U.S. Survey Research team, as a couple of weeks prior to the Plaintiff's termination, a new college graduate, Gabriel Schmittlein, was hired into the U.S. Survey Research team, the same team as the Plaintiff.

122.   In addition, at the same time a second new hire was brought into Accenture Research in the U.S.

123.   Given these hiring and firing actions by the U.S. Survey Research team and the broader U.S. Accenture Research team, the termination of the Plaintiff cannot be seen as a result of any global directive to shed either headcount or part of any cost cutting program.

**O. During The Termination Call, Defendant Hintermann Also Admits To Defendant Harvey's Involvement In the Wrongful Orchestration Of The Plaintiff's Termination**

124.   During the Termination Call, Defendant Hintermann admitted that although the decision to terminate the Plaintiff's employment was ultimately his to make, Defendant Harvey had input into the decision. ("September 25 Hintermann Admission").

125.   With the September 25 Hintermann Admission, both the wrongful involvement by Defendant Harvey with her unlawful discriminatory intentions toward the Plaintiff and the true unlawful reason for the Plaintiff's termination are apparent.

**P. Defendant Accenture Repudiates "Cost Cutting" Termination Reason Offered By Defendant Hintermann And Offers The Equally False "Poor Performance" Termination Reason In Its EEOC Filings.**

126.    During the EEOC proceedings, in response to Defendant Hintermann's assertion that the Plaintiff's "role will cease to exist", the Plaintiff presented overwhelming evidence that the Plaintiff's role did not "cease to exist" and in fact, the role needed to continue for it was in high demand and critical to ongoing high profile projects of Defendant Accenture.

127.    The Plaintiff pled in her EEOC Position Statement and Reply that:

   a.  the Plaintiff met all of her chargeability targets for each quarter of FY'20 with exceptional feedback, and the survey team was busier than ever. *See* Exhibit B,

   b.  The Plaintiff had a pipeline of work that would continue well into FY'21,

   c.  The Plaintiff's project pipeline was also in direct alignment to business priorities and involved some of the highest profile and most iconic projects in Accenture: Tech Vision, State of Cyber Resilience, and AI: Built to Scale,

   d.  When some of the Plaintiff's project sponsors learned that the Plaintiff was terminated, they were both surprised and disappointed, left without a seasoned survey researcher with the knowledge needed to continue their work.

   *See* Plaintiff's EEOC Position Statement and Reply, EEOC # 530-2021-00614.

128.    By the time of the filing of Defendant Accenture's Reply to the Plaintiff's EEOC charge, the rational for the Plaintiff's termination had radically changed. In Reply to the Plaintiff's EEOC Charge of Discrimination, Defendant Accenture completely repudiated Defendant Hintermann's "cost cutting" rational and statements about the termination not being performance related. Instead, Defendant Accenture embarked on yet another factually unsupported defense narrative that the Plaintiff was terminated for

poor work performance and for being in the "bottom 5%" of the Accenture Research workforce.

129.    In support of Defendant Accenture's second false defense for the termination of the Plaintiff, Defendant Accenture was again unable to offer any evidence of any poor performance by the Plaintiff or offer any evidence that the Plaintiff was in the "bottom 5%" of the workforce in terms of work performance.

130.    Defendant Accenture's complete repudiation of its first reason for the Plaintiff's termination and its offer of an equally unsupported and factually conflicting reason for the Plaintiff's termination is evidence of the false nature of both defenses. Straka v Comcast Cable, 897 F Supp 2d 346, 358 (WD Pa, 2012), *citing,* Reeves v Sanderson Plumbing, 530 US 137, 147 (2000).

131.    Accordingly, all of the rationales provided by Defendant Accenture as to the lawful reasons for the Plaintiff's termination must be rejected, and the reason offered by the Plaintiff accepted as the only reason that is supported factually.

**Q. The Plaintiff's Termination Was The Result Of Defendant Harvey's And Defendant Hintermann's Unlawful Disability Discrimination and Retaliation And By Defendant Accenture's Failure To Protect Against This Disability Discrimination and Retaliation.**

132.    The termination of the Plaintiff was not the result of poor performance, reduced workload, or any unavoidable reduction in the size of the U.S. Survey team.

133.    The Plaintiff was terminated in a bold move of retaliation for her FMLA filing and for requiring disability accommodations. A move conjured up by Defendant Harvey and Defendant Hintermann, and wrongfully allowed by Defendant Accenture, in an opportunistic attempt to disguise the termination as part of a company-wide workforce reduction, all in violation of the Americans with Disability Act, *supra* and the Family and Medical Leave Act of 1993, *supra*.

**R. The Plaintiff's Termination Was Also An Act Of Unlawful Age Discrimination In Violation Of The Age Discrimination In Employment Act.**

134.    In addition to the above unlawful disability discrimination and FMLA retaliation, the Plaintiff's termination was also the result of Defendant Accenture's campaign to replace older employees with younger employees and its tolerance of Defendant Hintermann's overt age bias against the Plaintiff as evidenced by his statements to the Plaintiff and his overt continuous acts of age discrimination in the training and promotion of employees under his control.

135.    On or about in the Fall of 2014, in the Plaintiff's introductory meeting with Defendant Hintermann as her new Career Counselor, Defendant Hintermann stated that he had seen her personnel records and her age, and with a smirk he said more than once, that they <u>would not be</u> discussing "long term career objectives". He said, they should look at 3-5 year objectives, but nothing "long term" ("Hintermann Introduction Meeting").

136.    The Plaintiff was 53 at the time of the Hintermann Introduction Meeting and that discussion occurred just shy of 6 years before the Plaintiff's termination.

137.    Defendant Hintermann continued to make openly age bias comments on global calls and in meetings during his tenure as the Plaintiff's Career Counselor. During his tenue as the Leader of Accenture Research and Plaintiff's Career Counselor, Defendant Hintermann routinely made statements praising millennials at the expense of older workers.

138.    In addition, Defendant Hintermann gave younger researchers training that older researchers were not offered. Leadership Development training was disproportionately offered to younger researchers, under the age of 45 to 50.

139.    Evidence of age bias was additionally witnessed across Defendant Accenture's entire Research Group in their public statements on the future employees of Accenture Research.

140.    On or about February 20, 2020, in a presentation for the Accenture Research <u>Women's Development Program</u>, the program blatantly states that Accenture seeks to promote a "future fit workforce...with a millennial/GenZ focus" *See* <u>AR WOMEN'S PROGRAM Training1 Career Development 20 February 2020</u>, *attached as* <u>Exhibit D</u>.

141.    This was a program under the guidance of, sponsored by, and introduced by Defendant Harvey on global calls in January of 2020.

142.    Finally, despite assertions by Defendant Hintermann that the Plaintiff's termination was the result of a cost cutting effort in the Accenture Research Group, Defendant Accenture's Research Group terminated the Plaintiff within the same month that they hired two much younger employees in the same geography, and one on the very same team as the Plaintiff.

143.    Defendant Accenture's blatant public statements and directives to replace older employees with younger employees coupled with Defendant Hintermann's age bias statements and age discrimination in the training of employees and the fallacy of the need to terminate the Plaintiff as a cost cutting measure while hiring younger employees to join the same small employee unit of Defendant Accenture, demonstrates that Defendant Accenture's and Defendant Hintermann's termination of the Plaintiff on September 25, 2020 was an act of wrongful age discrimination in violation of the ADEA.

## COUNT I
## PLAINTIFF v. DEFENDANT ACCENTURE
## PLAINTIFF'S CLAIM UNDER THE AMERICANS WITH DISABILITY ACT

144.    The Plaintiff hereby incorporates by reference all of the above allegations as though the same were herein set forth at length.

145.    The conduct of the Defendant Accenture, individually by and through its Agents, Defendant Harvey and Defendant Hintermann, as outlined above including, but not limited to, the termination of the Plaintiff for working reduced hours under disability accommodations and the FMLA constitutes unlawful retaliation in violation of the ADA.

146.    As a direct result of Defendant Accenture's unlawful and wrongful conduct, the Plaintiff has suffered substantial economic harm including, *inter alia*, lost wages, lost future wages, diminished earning capacity and lost benefits.

147.    In addition, Defendant Accenture's retaliatory conduct has caused the Plaintiff significant emotional distress.

148.    Further, said retaliation was willful, intentional, outrageous, and or in flagrant disregard of the provisions of the ADA and FMLA thereby entitling the Plaintiff to punitive damages.

WHEREFORE, the Plaintiff hereby demands judgment against Defendant Accenture for compensatory damages in an amount in excess of ($75,000) seventy-five thousand dollars, and for an award of punitive damages, plus interest, costs and for other further relief as this Honorable Court shall deem just and appropriate.

## COUNT II
## PLAINTIFF v. DEFENDANT ACCENTURE
## PLAINTIFF'S CLAIM UNDER THE AGE DISCRIMINATION IN
## EMPLOYMENT ACT

149.    The Plaintiff hereby incorporates by reference all of the above allegations as though the same were herein set forth at length.

150.    The conduct of Defendant Accenture, as outlined above, including but not limited to, the September 25, 2020 termination of the Plaintiff because of her age constitutes a violation of the ADEA.

151.    As a direct result of Defendant Accenture's unlawful and wrongful conduct, the Plaintiff has suffered substantial economic harm including, *inter alia*, lost wages and benefits.

152.    Furthermore, said retaliation was willful, intentional, and in flagrant disregard of the provisions of the ADEA thereby entitling the Plaintiff to liquidated damages as provided for under the ADEA.

WHEREFORE, the Plaintiff hereby demands judgment against Defendant Accenture for compensatory damages in an amount in excess of ($75,000) seventy-five thousand dollars, and for an award of punitive damages, plus interest, costs and for other further relief as this Honorable Court shall deem just and appropriate.

## COUNT III
### PLAINTIFF v. DEFENDANT ACCENTURE
### PLAINTIFF'S CLAIM UNDER THE PHRA

153.    The Plaintiff hereby incorporates by reference all of the above allegations as though the same were herein set forth at length.

154.    The conduct of Defendant Accenture, as outlined above, including but not limited to, the September 25, 2020 termination of the Plaintiff because of her age, handicap and/or disabilities constitute a violation of the PHRA.

155.    As a direct result of Defendant Accenture's unlawful and wrongful conduct, the Plaintiff has suffered substantial economic harm including, *inter alia*, lost wages and benefits.

156.    In addition, Defendant Accenture's retaliatory conduct has caused the Plaintiff significant emotional distress.

WHEREFORE, the Plaintiff hereby demands judgment against Defendant Accenture for compensatory damages in an amount in excess of ($75,000) seventy-five thousand dollars, and for an award of punitive damages, plus interest, costs and for other further relief as this Honorable Court shall deem just and appropriate.

**COUNT IV**
**PLAINTIFF v. DEFENDANT HARVEY**
**INTERFERENCE WITH CONTRACTUAL RELATIONS**

157.    The Plaintiff hereby incorporates by reference all of the above allegations as though the same were herein set forth at length.

158.    The terms of the of the Plaintiff's employment with Defendant Accenture were contractual relations between the Defendant Accenture, a limited liability partnership and the Plaintiff.

159.    Upon information and belief, Defendant Harvey, in her conversations and or writings and in person meetings with Defendant Hintermann, senior management at Defendant Accenture and the Human Resource personnel of Defendant Accenture during each of the annual performance evaluations of the Plaintiff and at the final performance evaluation of the Plaintiff in the Summer of 2020, made material misrepresentations about the Plaintiff and took actions to cause Defendant Accenture to end the employment of the Plaintiff under false pretenses ("Harvey Misrepresentations").

160.    Upon information and belief, the Harvey Misrepresentations by Defendant Harvey constitute purposeful actions and were specifically intended to harm the existing employment relations between Defendant Accenture and the Plaintiff.

161.    At the times, the Harvey Misrepresentations were being made, Defendant Harvey was no longer the appointed career counselor agent of the Plaintiff for she had been summarily removed from that position by Defendant Accenture back in the Fall of 2014.

162.    As the mere former career counselor of the Plaintiff, Defendant Harvey lacked official capacity to make the Harvey Misrepresentations.

163.    As the mere former career counselor of the Plaintiff, Defendant Harvey made the material misrepresentations about the Plaintiff to Defendant Accenture and Defendant Hintermann and took actions in the absence of any privilege or justification.

164.    As a result of the material misrepresentations and actions made by Defendant Harvey in the Harvey Misrepresentations, the Plaintiff has sustained a loss of employment with Defendant Accenture and loss of reputation in general.

WHEREFORE, the Plaintiff hereby demands judgment against Defendant Harvey for compensatory damages in an amount in excess of ($75,000) seventy-five thousand dollars, and for an award of punitive damages, plus interest, costs and for other further relief as this Honorable Court shall deem just and appropriate.

**COUNT V**
**PLAINTIFF v. DEFENDANT HARVEY**
**AND DEFENDANT HINTERMANN**
**DEFAMATION**

165.    The Plaintiff hereby incorporates by reference all of the above allegations as though the same were herein set forth at length.

166.    On or about September of 2020, Defendant Harvey and Defendant Hintermann published emails and other written communications knowingly stating falsehoods that the Plaintiff performed poorly in comparison to the rest of the employees at Accenture and or had a position that needed to be cut to those at Defendant Accenture

in charge of determining who would be terminated at Defendant Accenture ("2020 Evaluation Communications").

167.    Upon information and belief, on or about May of 2021, during Defendant Accenture's preparation of its reply to Charge of Discrimination, Defendant Harvey and Defendant Hintermann published emails and other written communications knowingly stated falsehoods that the Plaintiff performed in the bottom 5% of the employees at Accenture to those at Defendant Accenture in charge of evaluating any offer to settle the Plaintiff's EEOC matter and to counsel for Defendant Accenture in the EEOC proceedings ("EEOC Evaluation Communications").

168.    The 2020 Evaluation Communications, EEOC Evaluation Communications, and other written communications by Defendant Harvey and Hintermann regarding the work performance of the Plaintiff were false as it pertains to the Plaintiff.

169.    The 2020 Evaluation Communications and EEOC Evaluation Communications by Defendant Harvey were not supervisory assessments of Plaintiff LaFiandra as Defendant Harvey has ceased being Plaintiff LaFiandra's appointed career counselor after she was summarily removed from that position by Defendant Accenture back in the Fall of 2014.

170.    The 2020 Evaluation Communications, EEOC Evaluation Communications  and other written communications are slanderous and/or libelous on their face.

171.    The 2020 Evaluation Communications, EEOC Evaluation Communications and other communications clearly expose the Plaintiff to hatred,

contempt, ridicule and obloquy because it accuses the Plaintiff of the poor job performance of the Plaintiff without any factual basis.

172.    The    2020    Evaluation    Communications,    EEOC    Evaluation Communications and other communications were seen and read on or about September 2020, immediately prior to the Plaintiff's termination for poor work performance and during the critical settlement period of the EEOC proceedings.

173.    As a proximate result of the above described publications, the Plaintiff has suffered and will continue to suffer a loss of income, reputation, shame, mortification and injury to his feelings all to her great determent.

174.    The    2020    Evaluation    Communications,    EEOC    Evaluation Communications and other communications were not privileged because they were published by Defendant Harvey and Defendant Hintermann with malice, hatred and ill will toward the Plaintiff and with a desire to injure her.

175.    The Evaluation Communications, EEOC Evaluation Communications directly contradicted the statements made in termination call of September 25, 2020 ("Termination Call") as to the reason for the Plaintiff's termination.

176.    In the Termination Call, Defendant Hintermann stated to the Plaintiff, that her termination was unequivocally "not related to performance" but as a mere "cost efficiency program that has been decided" and

177.    When repeatedly asked in the Termination Call why she was being fired, Defendant Hintermann, without any reservation, stated the Plaintiff's termination was not for poor performance but that her "role will cease to exist".

178.     The Evaluation Communications, EEOC Evaluation Communications were made by Defendant Harvey and Defendant Hintermann with the full knowledge that they were factually false.

179.     The Evaluation Communications, EEOC Evaluation Communications were not mere opinions by the Defendants of the Plaintiff's work performance but instead made to facilitate and then cover up the unlawful reason for the Plaintiff's termination.

180.     The Evaluation Communications, EEOC Evaluation Communications were made with malice, hatred and ill will toward the Plaintiff for they were made to cover up the Defendant's unlawful reason for the termination of the Plaintiff and with the knowledge that they were factually false.

181.     Since the Evaluation Communications, EEOC Evaluation Communications were made with malice, hatred and ill will toward the Plaintiff, they were a clear abuse of any privilege.

WHEREFORE, the Plaintiff hereby demands judgment against Defendant Harvey and Defendant Hintermann for compensatory damages in an amount in excess of ($75,000) seventy-five thousand dollars, and for an award of punitive damages, plus interest, costs and for other further relief as this Honorable Court shall deem just and appropriate.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff seeks damages to the extent that she has been harmed by the Defendants' unlawful and tortious conduct and specifically prays that the Court grant the following relief:

A.   Award to the Plaintiff back salary, wages, fringe benefits, front pay, and other allowable damages, together with prejudgment interest pursuant to the ADA, ADEA, and/or PHRA;

B.  Award to the Plaintiff, compensatory damages pursuant to the ADA and/or PHRA;

C.  Award to the Plaintiff liquidated damages pursuant to the ADEA;

D.  Award to the Plaintiff, punitive damages pursuant to the ADA;

E.  Award to the Plaintiff and her counsel, attorney fees, costs and disbursements pursuant to the ADA, ADEA, FMLA and/or PHRA; and,

F.  Award to the Plaintiff damages for her common law claims of interference with contractual relations, defamation, liable, and slander,

G.  Any other relief that this Court deems appropriate.

## **JURY DEMAND**

The Plaintiff demands trial by jury of all issues so triable.

Respectfully submitted,

_____
Kenneth LaFiandra, Esquire
Counsel for Plaintiff Lynn LaFiandra
798 Woodlea Road
Bryn Mawr, PA  19091
klafiandra@comcast.net
(215) 588-9978 (mobile)
(610) 527-8980 (fax)

Dated: 11.14.21